IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| Plaintiff, ) ) | Case No. 21-cv-4027 |
| v. ) ) | Judge Robert M. Dow, Jr. |
| LUPO SECURITIES LLC, FKA ALPHAGEN SECURITIES, ) ) ) | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

The United States Securities and Exchange Commission ("SEC") brings this action against Defendant Lupo Securities, LLC (formerly known as Alphagen Securities, LLC) alleging a violation of Rule 14e-4, commonly referred to as the "short tender rule," promulgated under the Securities Exchange Act of 1934. Before the Court is Defendant's motion to dismiss [22]. For the reasons below, Defendant's motion is denied. The case will be transferred to another judge to set further case management deadlines.

**I.  Background**[1]

    **A.  Partial Tender Offers**

A "partial tender offer" as relevant for this action is an offer by a public company to its shareholders to exchange less than all of the company's outstanding shares of stock for other stock, and for which shares tendered by shareholders are accepted for a specified period of time—the "proration period." [1 at ¶¶ 16-17]; see also 17 C.F.R. § 240.14e-4(a)(5). When a public company

---

[1] For purposes of Defendant's motion to dismiss, the Court accepts as true all well-pled allegations set forth in the complaint [1] and draws all reasonable inference in Plaintiff's favor. See *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

announces a partial tender offer and its shareholders tender more shares than the company offered to accept, the tender offer is considered "oversubscribed," and the company is required to accept shares on a pro rata basis according to the number of shares each person tenders. [*Id.* at ¶ 17.] The percentage of tendered shares accepted by the public company relative to the total shares subject to pro rata acceptance is known as the "proration ratio" or "proration factor." [*Id.*] By their nature, partial tender offers involve risk to a public company's shareholders that not all of the shares a shareholder tenders will be accepted—referred to as "proration risk." [*Id.*]

"Call options" provide the holder the right to purchase a specific amount of stock at a specified price (the "strike" or "exercise" price) for a certain period of time. [*Id.* at ¶ 19.] Investors buy call options when they think the share price of the underlying stock will rise. [*Id.*] They sell (or "write") calls if they think the share price will fall. [*Id.*] If the exercise price of a call option is less than the market price of the stock, the call option is said to be "in-the-money." [*Id.* at ¶ 24.] Conversely, "put options" (or "puts") provide the holder the right to sell a specific amount of stock at a specified strike price. [*Id.* at ¶ 23.] If an investor holding a put option chooses to exercise the option, the seller (or writer) of the put option is obligated to buy the stock from the holder at the strike price. [*Id.*] Investors buy puts if they think the share price of the underlying stock will fall. [*Id.*] They sell puts if they think the share price will rise. [*Id.*]

A "short tender" is an investing practice by which the investor participating in a partial tender offer tenders more stock than the investor owns to avoid or reduce the investor's proration risk. [*Id.* at ¶ 18.] A "hedged tender" is a practice by which an investor tenders shares it owns as part of a partial tender offer, then sells some or all of those tendered shares after the investor's initial tender but before the partial tender offer expires. [*Id.* at ¶ 21.] The investor can accomplish the same result by writing call options instead of selling shares. [*Id.*] Short tenders and hedged

2

tenders have the same effect of diluting the pro rata acceptance of other investors. [*Id.* at ¶ 22.] Both practices artificially increase the pool of shares tendered for a partial tender offer because, in the case of short tendering, the investor tenders shares that do not actually exist, and in the case of hedged tendering, there is a possibility that the same shares are effectively tendered by multiple shareholders. [*Id.*]

### B. The Lockheed Martin Partial Tender Offer

Lockheed Martin Corporation ("Lockheed") is a public company registered with the SEC whose common stock is traded on the New York Stock Exchange under the trading symbol "LMT." [1 at ¶ 13.] The company is headquartered in Bethesda, Maryland. [*Id.*] Lockheed is not a party to this action.

On January 26, 2016, Lockheed announced the spinoff of its part of its business to Leidos Holdings, Inc. ("Leidos"). [*Id.* at ¶ 32.] On July 11, 2016, Lockheed announced the start of a partial tender offer as part of the spinoff. [*Id.* at ¶ 33.] The partial tender offer would provide Lockheed stockholders with the opportunity to exchange their shares of Lockheed common stock for shares of Abacus Innovations Corporation ("Abacus"). [*Id.*] Abacus shares would then be converted into an equal number of shares of Leidos common stock. [*Id.*] Prior to this exchange, Leidos would declare a $13.64 special dividend which tendering Lockheed stockholders would not receive. [*Id.*] Lockheed's announcement also detailed that it would determine the ratio at which shares of Lockheed common stock would be exchanged for Abacus common stock (which would be converted into an equal number of shares of Leidos common stock) based on the average of the daily volume-weighted average prices ("VWAPs") of shares of Lockheed common stock and Leidos common stock on the NYSE on each of three valuation dates ending on the third trading day before the partial tender offer expired, subject to an exchange ratio upper limit. [*Id.* at ¶ 34.]

3

Lockheed's partial tender offer expired on August 16, 2016, at 8 a.m. Eastern Daylight Saving Time. [*Id.*]

### C. Lupo's Participation in the Lockheed Partial Tender Offer

Lupo Securities ("Lupo") is an Illinois limited liability company organized on June 19, 1997, with offices in Chicago, Illinois. [1 at ¶ 12.] Lupo is a wholly owned subsidiary of Lupo Holding Company, LLC ("Lupo Holding"), which was formed in Delaware. [*Id.*] Lupo was an SEC-registered broker-dealer, during which time it engaged in trading in its own account and used ABN Amro Clearing Chicago ("ABN Amro") as its clearing firm. [*Id.*] Lupo later terminated its SEC registration on January 30, 2021. [*Id.*] Lupo's chief compliance officer ("Lupo CCO") was Plaintiff's chief compliance officer and assistant risk manager in July and August 2016. [*Id.* at ¶ 14.] Lupo CCO held several FINRA-issued securities licenses: Series 3, 4, 7, 24, 53, 55, and 63. [*Id.*] Lupo Trader co-managed and held a two-thirds ownership interest in Lupo Holding during July and August 2016. [*Id.* at ¶ 15.] He was also an owner and Class A trader for Lupo Securities. [*Id.* at ¶ 15.]

Between July 12 and August 15, 2016, Lupo Securities, through its agent Lupo Trader, purchased 1,000,000 shares of Lockheed common stock, thereby acquiring a long position in Lockheed shares. [*Id.* at ¶ 35.] During this same time, Lupo Securities, through its agent Lupo Trader, purchased and/or sold Leidos common stock and various Lockheed and Leidos options. [*Id.*] On August 12, 2016, Lockheed announced that stockholders who had tendered Lockheed stock into the partial tender offer would receive 8.2136 Leidos shares for each accepted share of Lockheed, and that a maximum of 9,369,694 shares—approximately 3% of Lockheed's outstanding common stock—would be accepted. [*Id.* at ¶36.]

The SEC asserts that based on the VWAP of Lockheed and Leidos securities on August 15, 2016, the value of the consideration offered for each Lockheed share accepted in the partial tender offer was $302.84. [*Id.* at ¶ 38.] Accordingly, compared to the market price of Lockheed stock, there was a significant premium of $37.07 per accepted Lockheed share, and standardized call options written on or after July 11 with a strike price below $302.84 constituted short positions under Rule 14e-4. [*Id.*] At the close of trading on August 15, 2016, Lupo held positions in Lockheed and Leidos securities, including long 1,000,000 shares of Lockheed stock, short 7,425 Lockheed standardized call options with a $275 strike price, and short 1,825 Lockheed standardized call options with a $300 strike price.[2] [*Id.* at ¶ 39.] Lupo wrote these call options on or after July 11, 2016. [*Id.*]

Lupo's "Written Supervisory Procedures Manual" provides that before participating in a partial tender offer, a Lupo trader must obtain confirmation from Lupo CCO or an operation staff person that Lupo's net long position is equal to or exceeds the proposed quantity to be tendered. [*Id.* at ¶ 40.] Accordingly, on August 15, 2016, Lupo CCO reviewed Lupo's partial tender offer instructions and sent them to Lupo's clearing firm, ABN Amro, to determine whether Lupo's tender would comply with Rule 14e-4. [*Id.* at ¶ 41.] According to the complaint, the CCO's review did not comport with Rule 14e-4. [*Id.*] Instead of determining the value of the consideration *offered*, Lupo CCO estimated the value that Lupo would *receive* by randomly picking a number less than ten percent as his estimate of the proration ratio, and then using that estimate to approximate the combined value of both the shares that would be accepted by Lockheed and those that would not be accepted. [*Id.*] Lupo CCO estimated that Lupo would receive approximately $300 in value from the less than ten percent of Lockheed shares tendered by Lupo

---

[2] Each standardized call option is equivalent to 100 shares. [See 1, at ¶ 19.]

that he estimated would be accepted by Loockheed, and much less than $300 in value from the greater than ninety percent of the shares he estimated would not be accepted by Lockheed. [*Id.*] Lupo CCO estimated that the combined value of the 1,000,000 shares tendered by Lupo was less than $275 per share, and on that basis, he decided that the call options held by Lupo were not short positions under Rule 14e-4. [*Id.*] Thus, the 9,250 call options Lupo had written with $300 or $275 strike prices were not "short positions," and thus could be tendered into the Lockheed partial tender offer. [*Id.*]

The SEC alleges that Lupo CCO did not discuss his calculations with Lupo Trader, memorialize his calculations in any way, or consult Lupo's Rule 14e-4 procedures or the text of Rule 14e-4 prior to performing his calculations on August 15, 2016. [*Id.* at ¶ 42.] Furthermore, Lupo Trader did not receive any training or instruction on how to comply with Rule 14e-4. [*Id.* at ¶ 43.] Lupo never provided Lupo CCO with a compliance-officer manual, any training or courses related to securities laws, rules, or regulations, or any compliance training while he was Lupo's CCO. [*Id.* at ¶ 44.]

On August 15, 2016, Lupo instructed ABN Amro to tender its 1,000,000 shares of Lockheed as part of the partial tender offer. [*Id.* at ¶ 45.] On that day, Lupo was long 1,000,000 Lockheed shares while still being short 7,425 Lockheed standardized call options with a strike price of $275 and 1,825 Lockheed standardized call options with a strike price of $300.[3] [*Id.* at ¶ 47.]

Lockheed's partial tender offer expired at 8 a.m. (Eastern Daylight Saving Time) on August 16, 2016. [*Id.* at ¶ 48.] 95,517,064 shares of Lockheed common stock were tendered as part of Lockheed's partial tender offer—86,148,370 more shares than Lockheed had agreed to accept—

---

[3] All the standardized call options represented 100 shares of Lockheed common stock per option. [1 at ¶ 47.]

resulting in a final proration ratio of approximately 8.05 percent. [*Id.*] That day, Lupo sold short 42,500 Leidos shares. [*Id.* at ¶ 49.] It also exercised 6,150 Leidos put options on August 19, 2016. [*Id.*] On August 23, 2016, Lockheed accepted 80,520 of Lupo's tendered shares, and Lupo received 661,359 Leidos shares as a result, at a premium of $37.07 per share accepted based on the prices of Lockheed and Leidos on August 15, 2016. [*Id.* at ¶ 50.] Lupo sold 3,850 Leidos shares on August 23, 2016, and 9 Leidos shares on August 24, 2016. [*Id.* at ¶ 51.]

### D.     Rule 14e-4

Rule 14e-4, 17 C.F.R. § 240.14e-4, is designed to prohibit investors from tendering more shares of stock than they own. [1 at ¶ 26.] Under Rule 14e-4, an investor may tender shares as part of a partial tender offer only if he has a "net long position" in the shares greater than or equal to the amount of shares tendered in the partial tender offer both at the time of tender and at the end of the proration period. [*Id.*]

A "long position" refers to the amount of securities an investor owns. [1 at ¶ 28.] The focal point in this case is in the Rule's definition of a person's "short position." Rule 14e-4 defines a "short position" as including the amount of stock that a person (A) has sold or entered into a binding contract to sell, (B) has borrowed, (C) has written a non-standardized call option, or:

> (D) Is obligated to deliver upon exercise of a standardized call option on or after the date that a tender offer is first publicly announced or otherwise made known by the bidder to holders of the security to be acquired, if the exercise price of such option is lower than the highest tender offer price or stated amount of the consideration offered for the subject security.

17 C.F.R. § 240.14e-4(a)(1)(ii).

A person's "net long position" equals "the excess, if any, of such person's 'long position' over such person's 'short position.'" 17 C.F.R. § 240.14e-4(a)(1)(i). For example, an investor who buys 100 shares of stock, then takes a short position in 50 shares of the same stock, has a net

7

long position in that stock is 50 shares. [1 at ¶ 29.] In the context of a partial tender offer, an investor's net long position must be calculated both at the time of the tender and at the end of the proration period. [*Id.*]

E.   **Alleged Securities Law Violations**

On July 29, 2021, the SEC filed a single-count complaint against Lupo, alleging that Lupo tendered more shares than it owned in the Lockheed partial tender offer in violation of Rule 14e-4 under the Exchange Act, 17 C.F.R. § 240.143-4. The SEC seeks relief in the form of: (i) permanent injunction against any future Rule 14e-4 violations; (ii) disgorgement of all ill-gotten gains; and (iii) payment of civil monetary penalties under Exchange Act Section 21(d)(3), 15 U.S.C. § 78u(d)(3). [1 at 13.]

The SEC contends that if Lupo tendered only its net long position, then 6,040 of its tendered shares would have been accepted, and it would have received 49,607 Leidos shares. [*Id.* at ¶ 52.] Thus, according to the SEC, as a result of its "unlawful tender," Lupo received 611,752 more Leidos shares than it should have, resulting in ill-gotten gains of more than $1 million. [*Id.* at ¶ 53.] The SEC has not exempted Lupo's tender pursuant to Rule 14e-4(c). [*Id.* at ¶ 54.]

II.  **Legal Standard**

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra*

*Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiff's well-pleaded factual allegations and draws all reasonable inferences in Plaintiff's favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). However, "[t]o survive a motion to dismiss, the well-pleaded facts of the complaint must allow the court to infer more than the mere possibility of misconduct." *Langworthy v. Honeywell Life & Acc. Ins. Plan*, 2009 WL 3464131, at *2 (N.D. Ill. Oct. 22, 2009) (citing *Iqbal*, 556 U.S. at 679). Additionally, the Court "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (cleaned up) (quoting *Iqbal*, 556 U.S. at 678). Evaluating "whether a complaint states a plausible claim" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

**III. Analysis**

In this enforcement action, the SEC alleges that Lupo violated Rule 14e-4 while participating in the 2016 Lockheed Martin partial tender offer. Specifically, the SEC asserts that Lupo inflated its net long position when it failed to deduct 9,250 outstanding call options it had written from its long position in violation of Rule 14e-4(a)(1)(ii)(D). Lupo seeks dismissal on ground that Rule 14e-4 does not require it to deduct the call options at issue.

A. The Dispute Over Rule 14e-4

This case is about whether Lupo complied with Rule 14e-4 when it tendered 1,000,000 Lockheed shares on August 15, 2016 during the company's partial tender offer. The SEC asserts that Lupo's 9,250 written call options—with strike prices of $300 and $275—were short positions under Rule 14e-4 and should have been factored into the equation for calculating Lupo's long position. By omitting its 9,250 written call options, the SEC argues that Lupo significantly understated its short position under the Rule—thereby inflating its net long position—and tendered more shares than it owned in violation of Rule 14e-4. Defendant maintains that the Rule does not require it to have deducted the 9,250 outstanding call options from its net long position, thus it had the right to tender 1,000,000 shares into the Lockheed partial tender offer, because the options' strike prices were $300 and $275, which were not "lower than the highest tender price offered or the stated amount of consideration offered."

The question here asks what the "highest tender offer price or stated amount of the consideration offered for the subject security" was in the Lockheed partial tender offer. The SEC calculates the value of consideration offered in the following manner:

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|
| 8/15/16 Lockheed VWAP | 8/15/16 Leidos VWAP | Leidos Special Dividend | Net Leidos VWAP [(2)-(3)] | Published Exchange Ratio | Value of Consideration Offered [(4) x (5)] | Premium per Share Accepted [(6) – (1)] |
| $265.77 | $50.51 | $13.64 | $36.87 | 8.2136 | $302.84 | $37.07 |

The SEC's method applies the published exchange ratio of 8.2136 to the Net Leidos VWAP and arrives at $302.84 as the value of consideration offered.

Defendant calculates the value of consideration offered in the following manner:

10

| VWAP of Leidos stock on 8/15/2016 | - | Leidos Special Dividend | x | (5) Published Exchange Ratio | x | Proration Factor | + | Value of Returned Shares (Using VWAP of Lockheed stock on 8/15/2016) | = | Lupo's "Value of Consideration Offered" |
|---|---|---|---|---|---|---|---|---|---|---|
| $50.51 | | $13.64 | | 8.2136 | | 8.05% | | (91.95% x $265.77) | | $268.75 |

By including the proration factor of 8.05 in its calculation, Defendant arrives at a much lower value of consideration offered.

  **B. Plain Language of Rule 14e-4**

Before the Court is an issue of regulatory interpretation. This action is in its early stages, so the Court's objective in resolving this motion is not to decide which party has the better interpretation. Instead, the Court must consider only whether the SEC has plausibly alleged that Defendant violated Rule 14e-4. See *SEC v. Fife*, 2021 WL 5998525, at *4 (N.D. Ill. Dec. 20, 2021).

The Court applies the same rules to regulatory interpretation as it would to statutory interpretation. See *Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 382 (7th Cir. 2020). The Court asks first "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Exelon Generation Co., LLC v. Loc. 15 Int'l Bhd. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012) (quoting *Ioffe v. Skokie Motor Sales, Inc.*, 414 F.3d 708, 710 (7th Cir. 2005)). "This inquiry looks to the entire text of the regulation, its purpose and context, and precedents or authorities that can inform the analysis." *Bria Health Servs., LLC*, 950 F.3d at 383. The Court consults the rulemaking record only if the language of the regulation is ambiguous. *Id.*

11

Both parties claim that Rule 14e-4 is unambiguous, but, unsurprisingly, they propose conflicting interpretations of the text. The parties argue over the meaning of one phrase: "highest tender offer price or stated amount of the consideration offered." 17 C.F.R. § 240.14e-4(a)(1)(ii)(D). According to Lupo, "the phrase at issue speaks to the amount of consideration that a person could actually expect to receive upon tendering a share." [23 at 16.] Lupo asserts that the plain meaning of "highest tender offer price" refers to "*all of* the material terms of the tender offer," including the effect of the proration risk, and that "stated amount of consideration" means that "*all* of the material terms of a tender offer stated by the Company conducting the tender offer, including proration risk." [*Id.*] Put plainly, Lupo argues that the "highest tender offer price" and "stated amount of consideration" denote the price a shareholder can expect to actually receive for its tendered shares. [*Id.*] Because no shareholder participating in Lockheed's partial tender offer would have expected the company to accept 100% of the shares it tendered, the SEC's proposed value of consideration—$302.84—is incorrect. [*Id.*] The SEC responds that the plain meaning of the rule is more "straightforward" than Lupo's reading. [31 at 11.] The SEC asserts that the "consideration offered" in this case "means the thing that Lockheed proposed as payment to induce the tender of its shares as part of the Lockheed Offer: 8.2146 shares of Leidos." [*Id.*]

The Court finds that SEC's reading is credible such that the SEC has plausibly alleged that Defendant violated Rule 14e-4. *Fife*, 2021 WL 5998525, at *4. "To determine the plain meaning of words, [the Court] frequently look[s] to dictionary definitions." *United States v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015) (citation omitted). The SEC does so here, and notes that Merriam-Webster Online Dictionary defines "consideration" to "the inducement to a contract or other legal transaction." [31 at 11.] Black's Law Dictionary similarly defines "consideration" as "[s]omething (such as an act, a forbearance, or a return promise) bargained for and received by a

12

promisor from a promise" and "that which motivates a person to do something, esp. to engage in a legal act." *Consideration*, BLACK'S LAW DICTIONARY (11th ed. 2019). Merriam-Webster further defines "offer" in its verb form as "to propose as payment." [31 at 11.] In announcing its tender offer, Lockheed stated on numerous occasions that "Lockheed Martin stockholders are expected to receive approximately $111 in value of Abacus common stock for every $100 of Lockheed Martin common stock. This is subject to an upper limit of 8.2136 shares of Abacus common stock per share of Lockheed Martin common stock."[4] [23-1 at 5.] First, the use of the words "upper limit" plainly conveys that 8.2136 shares of Abacus stock per share of Lockheed Martin stock was the highest tender offer price. [*Id.*] Second, the number serving as "the inducement" to shareholders to tender stock, or "that which motives" those shareholders to participate in the offer, is the opportunity to receive up to 8.2136 shares of Abacus stock per share of Lockheed Martin share. [31 at 11.] Together, the SEC has plausibly alleged that Defendant violated Rule 14e-4. *Fife*, 2021 WL 5998525, at *4.

Defendant bases its argument on industry custom around partial tender offers rather than the text of the Rule. While it may be true that "partial tender offers are effectively always 'oversubscribed,'" and shareholders have grown accustomed to some degree of proration [23 at 3], Defendant's argument defies logic. To accept Defendant's argument, Rule 14e-4 would require participants in a partial tender offer to calculate their net long position by deducting from their long position written call options with exercise prices lower than a value of consideration offered

---

[4] The Court may consider the exhibits submitted by Defendant because they are referenced throughout the SEC's complaint. See *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice."). Plaintiff does not object to the Court's review of Defendant's exhibits, and in fact makes its own references to those exhibits. [See, *e.g.*, 31 at 12.]

13

that turns on an unknown exchange ratio which depends on a proration factor that one must simply predict. The Court finds this interpretation unlikely.

The SEC's interpretation of the disputed subsection also makes the most sense when considered in the context of Rule 14e-4 in its entirety. "[O]ftentimes the 'meaning—or ambiguity—of certain words or phrases may only become evident when placed in context. So when deciding whether the language is plain, [the Court] must read the words 'in their context and with a view to their place in the overall statutory scheme.'" *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Food and Drug Admin v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000)). Rule 14e-4 defines a "partial tender offer" as "a tender offer or request or invitation for tenders for less than all of the outstanding securities subject to the offer in which tenders are accepted either by lot or on a pro rata basis for a specified period of time[.]" 17 C.F.R. § 240.14e-4(a)(5). Despite Defendant's claim that calculating the value of consideration offered requires accounting for a "significant proration factor" [23 at 8], the text of the Rule itself indicates that proration risk has been already acknowledged and included in the Rule to the extent necessary, 17 C.F.R. § 240.14e-4(a)(5). It is counterintuitive to read proration into subsection (a)(1)(ii)(D) when the text does not mention it, and when another subsection of the Rule notes the possibility of shares being accepted on a pro rata basis. 17 C.F.R. § 240.14e-4(a)(1)(ii)(D).

Based on the plain meaning of Rule 14e-4, the SEC has plausibly alleged that Defendant violated the Rule in its participation in the Lockheed Martin partial tender offer. Because the plain language is unambiguous, the Court need not consult the rulemaking record. See *Bria Health Servs., LLC*, 950 F.3d at 383.

### C. Lupo's Constitutional Arguments

In the alternative, Lupo makes a variety of constitutional arguments to argue for dismissal of this matter. [See generally 23, 36.] None are availing.

#### 1. Void-for-Vagueness

Lupo first argues that Rule 14e-4 is unconstitutionally vague because the terms "highest tender offer price" and "stated amount of consideration" are undefined in the Rule or corresponding guidance and, therefore, it was unable to assess whether its call options should have been deducted from its long position. [23 at 24–29.] The SEC counters that the Rule and accompanying guidance are objectively clear and Lupo, as a sophisticated participant, was well-positioned to understand the Rule. [31 at 20–21.] The SEC further notes that the standard for vagueness in cases challenging economic regulations is less stringent and the Rule meets this lower standard. [*Id.*] The Court concludes that Rule 14e-4 is not unconstitutionally vague.

"The void for vagueness doctrine rests on the basic principle of due process that a law is unconstitutional if its prohibitions are not clearly defined." *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 519 (7th Cir. 2010) (quoting *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999)). However, the due process clause does not require "perfect clarity and precise guidance." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). Under the void-for-vagueness doctrine, the Court must invalidate statutes as unconstitutionally void-for-vagueness if it "1) does not provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or 2) fails to provide explicit standards to prevent arbitrary and discriminatory enforcement by those enforcing the statute." *United States v. Lim*, 444 F.3d 910, 915 (7th Cir. 2006) (citing *Karlin*, 188 F.3d at 458–59). "The degree of vagueness that the Constitution tolerates * * * depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates,*

*Inc.*, 455 U.S. 489, 498 (1982). Unlike statutes impacting First Amendment rights, the Court reviews economic regulations under a "less stringent standard[]," *Chi. Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 739 (7th Cir. 1987), and must consider the facts at hand, *Lim*, 444 F.3d at 915. The Court considers economic regulations under a less strict standard "because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Hoffman Estates,* 455 U.S. at 498; see also *United States v. Walton*, 36 F.3d 32, 35 (7th Cir. 1994) ("A higher degree of vagueness is tolerable in laws pertaining to economic regulation, where the persons subject to the law are more likely to plan their behavior and to seek legal advice before acting."). "[T]he fact that Congress could have employed '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted' was unconstitutionally vague." *Lim*, 444 F.3d at 916 (quoting *United States v. Powell*, 423 U.S. 87, 94 (1975)). Along those lines, "[a] statute need not define every term to survive a vagueness challenge." *Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 717 (7th Cir. 2016).

Rule 14e-4 is not unconstitutionally vague. At the outset, given that the Rule is an economic regulation, this Court's standard for vagueness is "less stringent," *Chi. Bd. of Realtors, Inc.*, 819 F.2d at 739, because businesses, like Lupo, "can be expected to consult relevant legislation in advance of action," *Hoffman Estates,* 455 U.S. at 498. As the SEC alleges, Lupo, as a relatively sophisticated party, had the opportunity to "plan [its] behavior and to seek legal advice before acting" but failed to do so. [1 at ¶¶ 41–43]; *Walton*, 36 F.3d at 35. Moreover, understanding Lockheed Martin's announcement in light of the plain text of the Rule, a "person of ordinary intelligence" would have "a reasonable opportunity to know what [the Rule] prohibited." *Lim*, 444 F.3d at 915. Lockheed Martin indicated to stockholders that it "will determine the ratio at

16

which shares of Lockheed Martin common stock and Abacus common stock will be exchanged based on the simple arithmetic average of the daily volume-weighted average prices of shares of Lockheed Martin common stock and Leidos common stock on the NYSE on each of three valuation dates ending on the third trading day prior to the expiration of the exchange offer, subject to the exchange ratio upper limit." [23-1 at 5.] Even though the terms "highest tender offer price" and "stated amount of the consideration offered for the subject security" are undefined in the Rule itself, the Rule need not define every term to survive a vagueness challenge. See *Brown*, 824 F.3d at 717. The application of the Rule is clear: Lockheed Martin stockholders would expect to receive approximately $111 in value of Abacus common stock for every $100 of Lockheed Martin common stock, subject to an upper limit of 8.2136 shares of Abacus common stock per share of Lockheed Martin common stock. [23-1 at 5.] While Lockheed Martin's guidance, coupled with the Rule's language, a reasonable person would understand how to calculate the "highest tender offer price" or "stated amount of consideration" under the Rule; thereby, that person would have a "reasonable opportunity to know what is prohibited" under the Rule. *Lim*, 444 F.3d at 915.

While "Congress could have employed clearer and more precise language," *id.* at 916 (cleaned up and quotation omitted), because due process does not require "perfect clarity and precise guidance," especially for economic regulations like Rule 14e-4, the Court finds that the Rule is not unconstitutionally vague, *Sherman,* 623 F.3d at 519.

2. **Unfair Surprise and Lack of Notice**

Lupo further argues that the government's enforcement action, as one of the first of its kind, constitutes "unfair surprise." [23 at 29.] Lupo contends that it had "no notice from the SEC that its method of assessing compliance with the Rule might result in it being sued" and contends that if the SEC wants to enforce the Rule as such, it must go through notice-and-comment

17

rulemaking. [*Id.* at 30.] The SEC disagrees, arguing that the potential for such surprise is "unlikely" given that Rule 14e-4 already underwent notice-and-comment rulemaking. [31 at 23.] The SEC further argues that it did not do an "about-face" because it is "merely applying the unambiguous text of Rule 14e-4 to Lupo's participation in the Lockheed Offer." [*Id.*] For much the same reasons as the Court rejects Lupo's void-for-vagueness arguments, the Court holds that the SEC's application of the Rule did not constitute unfair surprise.

Due process requires that parties receive fair notice before being deprived of property. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313–14 (1950). "In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *Wis. Res. Prot. Council v. Flambeau Min. Co.*, 727 F.3d 700, 708 (7th Cir. 2013) (quoting *Gen. Elec. Co. v. United States EPA*, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995)). "In determining whether a regulated party received fair notice of what conduct was prohibited or required of it prior to imposition of civil or criminal liability, [the Court] looks to regulations and other agency guidance." *Id.* "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner." *Id.* (cleaned up) (quoting *Howmet Corp v. EPA*, 614 F.3d 544, 553–54 (D.C. Cir. 2010)).

Lupo had fair notice of Rule 14e-4's contents such that it was not unfairly surprised by the SEC's enforcement action. Lupo's argument is predicated on the SEC's enforcement action constituting a "new interpretation" of Rule 14e-4 and therefore unfairly surprising it. [23 at 30.] Not so. As discussed above, the SEC applied the clear language of Rule 14e-4 to Lupo's

participation in the Lockheed Martin partial tender offer. Lupo had the text of the Rule, which in plain language instructed it to deduct certain call options from its net long position. 17 C.F.R. § 240.14e-4(a)(1)(ii). From Lockeed Martin's press release, Lupo understood how to calculate the "highest tender offer price" and "stated amount of the consideration offered for the subject security." *Id.*; [23-1 at 5.] Altogether, Lupo was likely "able to identify, with ascertainable certainty, the standards with which the agency expect[ed] [it] to conform." *Wis. Res. Prot. Council*, 727 F.3d at 708 (citation omitted). As such, the SEC did not unfairly surprise Lupo with this enforcement action. Because the language of the regulation is clear, the Court need not consult the accompanying regulatory guidance. *Id.*

### 3. *Auer* Deference

Finally, Lupo argues that the SEC's interpretation does not warrant *Auer* deference. [23 at 31.] However, as Lupo points out [*id.*], *Auer* deference only applies if the Court finds that the Rule is genuinely ambiguous. See also *Kisor v. Wilkie*, 139 S. Ct. 2400, 2410 (2019) (describing *Auer* deference as only applying in situations where a regulation is "genuinely ambiguous"). As the Court has found the Rule to be clear, Lupo's argument fails.

## IV. Conclusion

For the reasons above, Defendant's motion to dismiss [22] is denied. The case will be transferred to another judge to set further case management deadlines.

Dated: January 9, 2023

_____
Robert M. Dow, Jr.
United States District Judge

19